## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **ABDULAZIZ** | * | |
| *Plaintiff,* | * | |
| v. | * | **Civil Case No: 1:24-cv-03009-JMC** |
| **MUSA,** *et al.,* | * | |
| *Defendants.* | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff, Jamil Abdulaziz, initiated the present lawsuit on October 16, 2024, against Defendants Erten Musa and Pro Level Business Brokerage & Consulting LLC. (ECF No. 1). The matter arises from a brokerage contract through which Defendants assisted the sale of Plaintiff's businesses. *Id.* Plaintiff seeks a declaratory judgment to pierce the corporate veil and brought claims for breach of contract, fraudulent misrepresentation, breach of fiduciary duty, and a violation of the Maryland Uniform Fraudulent Conveyance Act, Md. Code Mon. Law, § 15-201, *et. seq*. *Id.* Presently pending before the Court are Defendants' Motion for Summary Judgment (ECF No. 26) and Plaintiff's Motion for Partial Summary Judgment as to Count II (ECF No. 27). The motions are fully briefed (ECF Nos. 26, 27, 30, 31, 32, 33) and no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons that follow, Defendants' motion summary judgment (ECF No. 26) will be GRANTED in part and DENIED in part and Plaintiff's motion for summary judgment (ECF No. 27) will be DENIED.

## I.     BACKGROUND[1]

---

[1] To begin, the parties make numerous arguments based on their interpretations of the record. The following facts are undisputed, unless specifically noted, or otherwise characterized as being the position of one of the parties.

a. Plaintiff-Defendant Pro Level Contract

The present dispute arises from the sale of Plaintiff's towing service business, GTS Towing LLC, for which Defendants acted as Plaintiff's broker. *See* (ECF Nos. 1-3; 26-5). Plaintiff engaged with Defendant Pro Level Business Brokerage & Consulting, LLC ("Pro Level") through its sole member, Defendant Musa. (ECF No. 26-5). The parties first engaged by way of a listing agreement (the "Listing Agreement") between Pro Level and Plaintiff. *Id.* The parties executed the Listing Agreement on December 27 and December 28, 2023. *Id.* at 6.[2] Under the Listing Agreement, Plaintiff agreed to "engage [Pro Level] exclusively to sell all or substantially all" of his businesses for a total sale price of $3,900,000.00. *Id.* at 1. "In consideration for [Pro Level's efforts to sell the Assets of the business, [Plaintiff] agrees to pay [Pro Level], at the time of settlement, 12%." *Id.*

b. Plaintiff-Nasim Contract Obligations

Thereafter, Defendant secured a buyer named Usman Nasim, ("Nasim") who is not a party to this action. *See*, (ECF Nos. 26-6 at 4-5; 26-8). On January 4, 2024, Nasim sent a letter of intent (the "LOI") to Defendant Musa indicating his desire to purchase Plaintiff's business for $3,700,000.00. (ECF No. 1-2). According to the LOI, Nasim would pay a $1,900,000.00 down payment and the rest of the remaining balance ($1,800,000) "12 months seller financing $75,000.00 monthly ARP and after 12 months pay off the loan $900,000.00." *Id.* There would also be a $100,000.00 earnest deposit within twenty-four hours of signing a purchase agreement. *Id.*

On February 6, and February 8, 2024, Plaintiff and Nasim executed a Business Asset Purchase Agreement ("BAPA"), which detailed the sale of Plaintiff's business to Nasim. (ECF

---

[2] When the Court cites to a specific page number or range of page numbers, the Court is referring to the page numbers provided in the electronic filing stamps located at the top of every electronically filed document. Where a document is not electronically stamped, the citation is instead to the number at the bottom of the page.

No. 26-8). Under BAPA, Nasim agreed to pay Plaintiff a purchase price of $3,550,000.00. *Id.* at 2. As indicated in the LOI, BAPA required a $1,900,000.00 down payment before closing. *Id.* Plaintiff also agreed to provide financing to help effectuate the remaining payments after closing. *See id.*

Later, on June 9, 2024, Plaintiff and Nasim executed an amendment to BAPA (the "Amendment"), which reduced the final purchase price from $3,550,000.00 to $3,000,000.00. (ECF No. 26-9). The Amendment did not impact the down payment. *Id.* On June 10, 2024, Nasim and Plaintiff executed a promissory note in the amount of $1,100,000.00, payable by twelve monthly installments. (ECF No. 1-7). Indeed, after the Amendment, which reduced the purchase price by $550,000.00, the remaining balance for which Plaintiff agreed to provide Nasim financing was $1,100,000.00 rather than $1,650,000.00. *See id.* Accordingly, each check would be for $50,000.00, due on the first of each month. *Id.*

c. Payments Between Plaintiff, Defendants, and Nasim

After Nasim and Plaintiff executed the Amendment and promissory note, Nasim was still required to make the $1,900,000.00 down payment. *See id.* With respect to the down payment, Nasim made two deposits via checks to Pro Level, which Defendants contend "were held in escrow for Closing." (ECF No. 26-1 at 3). Nasim testified he wrote one check for $630,000.00 and one for $350,000.00, which totaled to $980,000.00. (ECF No. 26-6 at 10). Each check was "deposited into…Pro Level's escrow." *Id.* Nasim also delivered $400,000.00 by way of cashier's checks to Plaintiff as part of the down payment. *Id.* In total, before closing, Nasim paid $1,380,000 in cash, of which $400,000.00 was paid directly to Plaintiff and $980,000.00 was paid to Pro Level, to be held in escrow for Plaintiff. *See id.*

However, Nasim had trouble sourcing the remaining cash. (ECF No 26-6 at 4). Accordingly, as the payments were due prior to closing, Nasim's cash sourcing challenges delayed the parties' ability to close on the sale. *Id.* Consequently, Nasim offered to pay the remaining balance by transferring the title of a 2018 Mercedes GTR ("GTR") valued at $120,000.00. *Id.* at 5-6. "As a part of escrow," Nasim delivered the GTR to Defendant Musa rather than to Plaintiff.[3] *Id.* at 6. At closing, Nasim paid an additional $160,000.00 directly to Plaintiff and issued a separate check in the amount of $150,000.00 directly to Plaintiff.[4] (ECF No. 26-6 at 11).

### d. Remaining Obligations between Defendant and Plaintiff

As for payment obligations between Plaintiff and Defendants, there exists rigorous dispute as to what was paid to whom and when. After execution of the Amendment, the 12% commission to which BABA entitled Defendant Pro Level was $360,000.00.[5] There arose a dispute as to whether the parties agreed upon a greater commission, set forth in more detail below. According to Defendant Musa, Pro Level disbursed to Plaintiff $660,000.00 by way of its escrow account. (ECF Nos. 26-1 at 4, 26-3 at 6). In support of this assertion, Defendants include a redacted bank record showing a withdrawal in the amount of $660,000.00 from the Pro Level escrow account on June 10, 2024. (ECF No. 26-10). According to Defendants, "[t]his amount paid to Plaintiff included a Thirty Thousand Dollar ($30,000.00) additional payment from Pro Level's commission

---

[3] The record presents some dispute as to how whether the GTR title was transferred to Plaintiff or to Defendant Musa as part of escrow. Defendant Musa (in his capacity as Defendant Pro Level's corporate designee) testified that Nasim transferred the GTR title to Musa, on behalf of Pro Level. (ECF No. 26-3 at 5). Plaintiff does not contend he ever received title to the GTR. It does not appear that the parties contemplated title transfer to Plaintiff. Further, Defendant Musa testified Defendant Pro Level disbursed the GTR after transfer as part of his commission. *Id.*

[4] In total, Nasim paid $710,000.00 directly to Plaintiff before and upon closing. Nasim conferred a value of $1,100,000.00 (by way of checks and the GTR) to Pro Level to be held in Escrow. To note, these amounts equal a total of $1,810,000.00 and not $1,900,000.00. The parties do not dispute whether Nasim paid the amounts he owed under the contract, nor is Nasim a party to the present litigation. At an unknown time, a separate legal dispute arose between Nasim and Plaintiff. (ECF No. 26-12).

[5] (3,000,000 x .12 = 360,000).

in order to keep the total purchase price at Closing at $3 Million." (ECF No. 26-3 at 101). To that

end, Plaintiff characterizes the record differently:

> Plaintiff has alleged that the Defendants falsely represented the amounts held in escrow ($1.1 Million vs. $980,000) as well as the source of $30,000. Specifically, Plaintiff alleges that Musa misrepresented to Plaintiff that $30,000 of the $630,000 distributed to Plaintiff was paid by Musa, who took possession of the GTR valued at $120,000. According to Defendants, they were entitled to receive $450,000 (15% commission). Using Defendants' numbers of $1.1 Million in escrow funds - $450,000 15% Commission= $650,000, not $660,000 reflected in the bank statement. [Defendant's Bank Record] on its face supports the Plaintiff's allegations that Musa gave Plaintiff $630,000 funds held in escrow and an additional $30,000 of Musa's personal funds.

(ECF No. 31 at 15).

With respect to the transfer of the GTR title, Defendant Musa (on behalf of Pro Level)

testified,

> Q: How is it that you, Mr. Musa, came into possession of the title of the GTR?
> A: So in the beginning, he[6] offered me for additional $90,000 for a truck. And I said okay. I can take the truck. I don't mind. He said, I want more cash. I said, okay. No problem. But on May 15, 2024, Nasim called me, and I picked up the GTR. I told [Plaintiff], what about this? He said, Brother, this is too much. I said, no, no, no. Tell me how much you want over. He said 120 minus 90. He said, $30,000. In addition, $30,000 and take the GTR. And we did it. I took—that's why I didn't pay him 620. I paid him 660,000 cashier's checks….

(ECF No. 26-3 at 6).

It is presumably this conversation that has led to many of the arguments analyzed below.

Though unclear from the summary judgment memoranda, from what the Court can discern, it

appears that the parties dispute whether Pro Level, and by extension, Defendant Musa, had the

authority under BAPA to arrange for this transfer of the GTR to Defendant Musa rather than to

Plaintiff. The Court can find no facts indicating the parties contemplated transferring the GTR to

Plaintiff.

---

[6] Presumably, Defendant Musa refers to Plaintiff here.

5

Defendant Musa testified that he was entitled to the GTR title because commission was actually 15%, contrary to the 12% commission under the Listing Agreement due to additional consulting services he provided, which he claims were not contemplated under the Listing Agreement. (ECF No. 31-2 at 3). He believes the transfer of the GTR would satisfy the additional 3% commission obligation. (ECF No. 31-2 at 12). Plaintiff does not appear to dispute that $120,000.00 would satisfy the additional 3% commission, were it to be valid, a point Plaintiff rigorously opposes. *See* (ECF No. 31). To that end, Defendant Musa testified "When I'm doing a brokerage, I'm just bringing the buyer and seller together. So that's the 12 percent. But if you want me to be consulting you, that's another 3% which it costs. That's what it is." (ECF No. 31-2 at 2). Defendant Musa "educated both the buyer and seller during the transactions because they didn't—they didn't even hire an attorney. And I told them a hundred times to hire an attorney." *Id.* at 2-3. Defendant Musa indicated that the Listing Agreement provides only for brokerage services and "[t]here is an agreement for 12 percent, and there is a shake agreement—handshake agreement for 3 percent." *Id.* at 12. Accordingly, the Listing Agreement is the only written agreement between Plaintiff and Defendants, and there exists no additional written consulting agreement. *See id.* Plaintiff now alleges Defendant Musa defrauded Plaintiff during the course of the sale in order to take the GTR. *See* (ECF Nos. 27, 31, 33).

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) requires the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute as to a material fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 600 (D. Md. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A nonmoving party "opposing a properly supported

motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)).

The Court is "required to view the facts and draw reasonable inferences in the light most favorable to" the nonmoving party. *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)). However, the Court must also "abide by the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Heckman v. Ryder Truck Rental, Inc.*, 962 F. Supp. 2d 792, 799–800 (D. Md. 2013) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). Consequently, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330–31 (4th Cir. 1998). "[I]n the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility." *Angelini v. Balt. Police Dep't*, 464 F. Supp. 3d 756, 776 (D. Md. 2020).

## III.    ANALYSIS

### A.    Defendants are Entitled to Summary Judgment on Count I Because No Fact Finder Could Find Clear and Convincing Evidence of Fraud or Evidence that Defendant Musa Used Defendant Pro Level as a Cloak to Perpetuate Fraud.

Defendants urge the Court to find there "is no legal basis for a declaratory judgment to pierce the corporate veil," and thus, Defendants are entitled to summary judgment with respect to Count I. (ECF No. 26-1 at 6). Plaintiff retorts, "[t]he core dispute in Count 1 is the alleged oral agreement to pay the Defendants 3% more than the 12% commission agreed upon in the fully executed and integrated Listing Agreement…Plaintiff seeks to hold Musa personally responsible for damages caused by Musa's actions on behalf of Pro Level." (ECF No. 31 at 2).

Defendants correctly point out that Maryland courts are reluctant to disregard a corporate entity's personal liability shield "in the absence of a finding of fraud. *Serio v. Baystate Properties, LLC.*, 209 Md.App. 545, 559 (Md. Ct. Spec. App. 20136). Indeed, piercing the corporate veil is an extraordinary equitable remedy. *See Hildreth v.* Tidewater, 378 Md. 724, 735 (2006). Thus, in *Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*, the Supreme Cort of Maryland recognized

> [T]he most frequently enunciated rule in Maryland is that although the courts will, in a proper case, disregard the corporate entity and deal with substance rather than form, as though a corporation did not exist, shareholders[7] generally are not held individually liable for debts or obligations of a corporation except where it is necessary to prevent fraud or enforce a paramount equity.

*Bart Arconti & Sons, Inc. v. Ames-Ennsi, Inc.*, 275 Md. 295, 301 (1975).

In *Bart Arconti & Son's, Inc.*'s wake, this rule "has been so narrowly construed that neither [the Appellate Court of Maryland] nor the [Supreme Court of Maryland] has ultimately 'found an equitable interest more important than the state's interest in limited shareholder liability.'" *Serio*, 209 Md.App. at 559-560. (quoting *Residential Warranty v. Bancroft Homes Greenspring Valley, Inc.*, 126 Md.App. 294, 307 n. 13 (1999)). "Despite the proclamation that a court may pierce the corporate veil to enforce a paramount equity, arguments that have urged a piercing of the veil for reasons other than fraud have failed in Maryland courts." *Residential Warranty*, 126 Md.App. at 307 (internal quotations omitted); *see also United Elec. Supply Co. v. Greencastle Gardens Section III Ltd. P'ship*, 36 Md.App. 70, 80 (Md. Ct. Spec. App. 1977) ("Corporate veils were not intended to provide false fronts as conveyances for pecuniary gain made from conduct that is statutorily proscribed."); *Maryland Trust Co. v. Tulip Realty Co. of Md.*, 220 Md. 339, 414 (1959) (finding it "unnecessary to pierce the corporate veil in this instance" despite clear evidence that certain

---

[7] Even in cases considering whether to pierce a limited liability company's corporate veil, courts look to the rules that apply to corporations. *See Serio*, 209 Md.App. at 259 (indicating "we look to case law discussing piercing a corporate vel for instruction" when considering whether to pierce a limited liability company's corporate veil).

stockholders acted fraudulently); *Fuller v. Horvath*, 42 Md.App. 671, 686 (Md. Ct. Spec. App. 1979) (discussing the requirements of requisite evidence to support a finding of fraud). Indeed, Maryland courts have identified three scenarios in which disregarding the corporate personal liability shield is proper:

> First. Where the corporation is used as a mere shield for the perpetration of a fraud, the courts will disregard the fiction of separate corporate entity.
>
> Second. The courts may consider a corporation as unencumbered by the fiction of corporate entity and deal with substance rather than form as though the corporation did not exist, in order to prevent evasion of legal obligations.
>
> Third. Where the stockholders themselves, or a parent corporation owning the stock of a subsidiary corporation, fail to observe the corporate entity, operating the business or dealing with the corporation's property as if it were their own, the courts will also disregard the corporate entity for the protection of third persons.

*Hildreth*, 378 Md. at 734.

Plaintiff insists there exists a genuine issue of material fact with respect to a finding of fraud or an alter ego. (ECF No. 31 at 2). Alternatively, Plaintiff avers piercing the corporate veil is necessary under a theory of paramount equity.[8]  *See id.*

       1.     Defendants are Entitled to Summary Judgment with Respect to Fraud.

"Maryland courts require parties seeking to pierce the corporate veil by alleging fraud to meet a higher standard and make a more vigorous factual showing than do other jurisdictions." *Baltimore Line Handling Co. v. Brophy*, 771 F.Supp.2d 531, 553 (D. Md. 2011) (applying Maryland state law). Evidence of fraud must be clear and convincing. *Residential Warranty Corp.*,

---

[8] "Even Maryland decisions that recognize alternate grounds for piercing the corporate veil have not done so absent a finding of fraud." *Serio*, 209 Md.App. at 561. Accordingly, "few decision have explicated or applied the concept of enforcing a 'paramount equity' even though the often-repeated rhetoric suggest it as a basis to disregard the entity distinct from fraud." *Id.* (citing *Travel Committee, Inc. v. Pan Am. World Airways, Inc.*, 91 Md.App. 123 (1992), *cert. denied,* 327 Md. 525, 610 A.2d 797 (1992)); *see also Ramlall v. MobilePro Corp.,* 202 Md.App. 20, 31 (2011) ("With no precedent approving this extraordinary remedy, we decline to pierce the corporate veil…based on the paramount equity justification."). The facts here are not so extraordinary such that a jury could find for Plaintiff under a theory of paramount equity absent a finding of fraud. Therefore, the primary inquiry is whether there exists a genuine issue of material fact of (1) fraud or (2) an alter ego.

126 Md.App. at 308; *see also Starfish Condominium Ass'n v. Yorkridge Service Corp., Inc.*, 295 Md. 693, 714 (1983) (requiring "the one charging fraud to establish by clear, specific facts, acts that in law constitute fraud").  To support a finding of fraud, Maryland courts look for a "deliberate intention and purpose of cheating and defrauding…the other party to the contract*." Colandrea v. Colandrea*, 42 Md.App. 421, 432 (1979).

In *Colandrea*, a Maryland court pierced the corporate veil on a finding of fraud when a husband and former shareholder of a corporation brought suit against the corporation, his ex-wife, who was the remaining shareholder, and several of her newly formed corporations.  *Id.* at 422. There, the plaintiff sought payments under certain promissory notes made to him in the name of the marital corporation.  *Id.* at 425. Piercing the corporate veil was proper because there was clear and convincing evidence of the defendant ex-wife's fraudulent intent.  *Id.* Specifically, the record showed the ex-wife fraudulently transferred assets from the marital corporation so she could profit from its established business without affording profits to her ex-husband. *Id.*  The court noted "[t]he effect of all these corporate machinations is obvious. By it [the defendant ex-wife] was able to continue the profitable business of [the marital corporation] without its attendant obligations to [the plaintiff ex-husband]. *Id.*

In contrast, the *Bart Arconti*[9] court made clear Maryland courts are reluctant to pierce the corporate veil even when there does exist evidence of some deception. *Bart Arconti & Sons, Inc.*, 275 Md. at 311-12. In *Bart Arconti*, the court refused to pierce the corporate veil even though the evidence showed the stockholders' conduct was designed to cause the corporation to evade a legal

---

[9] *Bart Arconti* involved a different procedural posture than the instant case.  *Bart Arconti*, 275 Md. at 305-06. There, the trial court pierced the corporate veil and assessed liability against the defendant corporation and officers. *See id.* On appeal, the *Bart Arconti* court reversed, holding the ruling was clearly erroneous.  *See id.* To note, the facts had already been found upon appeal.  *Id.* However, "the trial judge…made no reference to fraud…presumably because he was of the view that no evidence to support such a finding had been produced. Nor does appellee rely upon that ground in this Court."  *Id.* at 310-11. Therefore, though not exactly on point, *Bart Arconti* illustrates the demanding evidentiary threshold necessary to pierce the corporate veil in Maryland. *See id.* at 312.

obligation. *Id.* at 312. The record there showed that the corporation's defendant officers sought to avoid certain contractual obligations by using two of their other entities "to keep the…business of [the third entity] but without leaving any real asset [of the third entity] in that corporation." *Id.* at 309. Despite some showing of deception in an effort to avoid contract obligations, the court could find no precedent to "allow[] the corporate entity to be disregarded merely because it wished to prevent an evasion of legal obligations absent evidence of fraud." *Id.* at 312 (internal quotations omitted). There, even the evidence of an intent to evade the contractual obligations was not enough to support a finding of fraud. *See id.*

Moreover, summary judgment is proper when a fraudulent claim is predicated only on speculative evidence. *See, e.g.*, *Residential Warranty*, 126 Md.App. at 310-11. In *Residential Warranty*, the president and sole shareholder received an unexplained transfer of funds into his personal account, a portion of which came out of construction loans deposited into the corporation's account. *Id.* at 302. Following this transfer, the corporation was nearly insolvent. *Id.* Plaintiff argued this evidence showed that the sole shareholder "intentionally and secretly impoverished [the corporation] while covering up multiple major structural flaws." *Id.* at 308. According to the plaintiffs, the evidence supported an inference that the sole shareholder "siphoned [the corporation's] funds to prevent [the corporation] both from making proper repairs required" under the contract at issue "and from indemnifying the [plaintiffs] for the expenses it incurred" due to its failure to perform properly. *Id.* The defendants argued that there was not clear and convincing evidence of fraud. *Id.* Siding with the defendants, the court reasoned an inference of fraud was "mere speculation" that lacked "factual evidence to link the distributions to fraudulent actions." *Id.* at 311.

Here, there is insufficient evidence upon which a fact finder could conclude by clear and convincing evidence that Defendant Musa used Defendant Pro Level to defraud Plaintiff such that the corporate veil could be pierced. *Id.* Even if a jury could find that Defendant Musa acted with the intent to avoid some of Defendant Pro Level's contract obligations to Plaintiff, such evidence was not enough to justify piercing the corporate veil in *Bart Acronti*. *See Bart Acronti*, 275 Md. at 311-12. The evidence of a title transfer in dispute under certain contract rights is much unlike that in *Colandrea*, in which the evidence showed a clear intent to cheat the shareholder's former husband out of financial rights to a martial corporation's stock. *Compare Colandrea*, 42 Md.App. at 428-29. Moreover, like the evidence in *Residential Warranty*, there exists no factual support from the record—and nor does Plaintiff cite to any—that links the title GTR title transfer to a fraudulent action or clear intent to defraud Plaintiff. *Residential Warranty*, 126 Md.App. at 311. The facts here are even less severe than those in *Residential Warranty*, as there is no evidence, nor even an argument, that Defendant Musa was motivated by a threat of insolvency. (ECF No. 31). Plaintiff relies only upon speculative interpretations of Defendant Musa's testimony in advance of its contention that "Musa used his control of Pro Level to unilaterally pay himself personally or unlawfully increase Pro Level's commission in direct contravention of Plaintiff's rights under the Listing Agreement." (ECF No. 31 at 4). Confusingly, Plaintiff emphasizes without evidentiary support that Defendant Musa titled the GTR in his name after Nasim attempted to renegotiate the sale. *Id.* at 3. Even if a jury finds this fact to be true, *Bart Acronti* and *Residential Warranty* foreclose recovery by way of piercing the corporate veil. *See Bart Acronti*, 275 Md. at 311-12; *Residential Warranty*, 126 Md.App. at 311. Moreover, the Court cannot find any factual support for this claim. There does exist factual support for the contention that Defendant Musa had title of the GTR. There is also evidence by way of Plaintiff's own testimony that he "never felt pressured"

by Defendant Musa during the sale process. (ECF No. 26-4 at 6). To be sure, a jury could very well find that Pro Level breached its contract obligations to Plaintiff. But there exists no factual support that entitles Plaintiff to such an extraordinary inference necessary to pierce the corporate veil. Thus, under Maryland's high bar no reasonable jury could find clear and convincing evidence of fraud. *See Bart Acronti*, 275 Md. at 311-12; *Residential Warranty*, 126 Md.App. at 311.

   2. Defendants are Entitled to Summary Judgment under the Alter Ego Doctrine.

In contrast, the alter-ego doctrine applies when there exists evidence of (1) "complete domination, not only of the finances, but of policy and business practice in respect to the transaction so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own," (2) "that such control [was] used by the defendant to commit fraud or wrong, to perpetrate the violation of the statutory or other positive legal duty, or dishonest and unjust act in contravention of the plaintiff's legal rights," and (3) "that such control and breach of duty proximately caused the injury or unjust loss." *Hildreth*, 378 Md. at 735. (cleaned up). "Although there appears to be no universal rule as to the specific criteria that courts will consider in determining whether to apply [the alter ego] doctrine," there exist certain factors that are commonly considered "when dealing with a single corporation." *Id.* They include

> (1) whether the corporation is inadequately capitalized, fails to observe corporate formalities, fails to issue stock or pay dividends, or operates without a profit, (2) whether there is commingling of corporate and personal assets, (3) whether there are non-functioning officers or directors, (4) whether the corporation is insolvent at the time of the transaction, and (5) the absence of corporate records.

*Id.*

In *Hildreth*, a Maryland plaintiff sought to pierce a New Jersey entity's corporate veil after its sole shareholder failed to fully disclose the corporation's identity, despite the existence of a Maryland corporation with the same name. *See id.* at 725-27.  At the time the plaintiff and

defendant first contracted, the defendant's corporation was not registered in Maryland. *Id.* After a contract dispute arose, the plaintiff eventually raised an argument to pierce the corporate veil. *Id.* at 730-31. Analyzing whether there was sufficient evidence to impose personal liability upon the shareholder under the alter ego doctrine, the court reasoned there was no evidence that the sole shareholder "exercised such complete domination over [the corporation] to warrant a conclusion that it had no separate mind, will or existence of its own." *Id.* at 736. (internal quotations omitted). Moreover, there was no evidence that the corporation was undercapitalized, that corporate formalities were not observed, that the corporation operated without a profit, that there were non-functioning officers or directors, that the company was involved when it entered into its arrangement with the Plaintiff, or any evidence of inadequate corporate records. *See id.* Though the plaintiff believed the defendant "was acting as an agent for an undisclosed or partially disclosed principal," any evidence there that tended to support a lack of disclosure was not enough to justify the extraordinary measure of piercing the corporate veil. *See id.; see also Roley v. Nat'l Pro. Exch., Inc.*, 474 F. Supp. 3d 708, 726-27 (D. Md. 2020) (declining to pierce the corporate veil when there was no evidence of any of the *Hildreth* factors).

Here, the undisputed facts construed in the light most favorable to Plaintiff do not represent the extraordinary circumstances Maryland courts require to pierce the corporate veil. While Plaintiff is clearly unhappy with the GTR title transfer to Defendant Musa, there exists no evidence on the record to satisfy the *Hildreth* factors. Specifically, there is no evidence—nor even an argument—that Pro Level is undercapitalized, insolvent, or lacks records. (ECF No. 31). Plaintiff reiterates many of the unavailing fraud arguments in support of its alter ego argument. *Id.* at 3-4. There appears to be some argument that Pro Level comingled funds with personal assets, and to that end, the record is unclear. *See id.* at 4. Even taking all inferences in the light most favorable

14

to Plaintiff, this ambiguity alone does not support an inference that Defendant Pro Level lacked a separate mind or existence from Defendant Musa such that the corporate veil can be pierced absent a finding of fraud.  *Hildreth*, 378 Md. at 735-36; *see also Bart Arconti & Sons, Inc.*, 275 Md. at 340. Moreover, Plaintiff points only to several instances in Defendant Musa's deposition in support of the contention that Defendant Musa had complete domination over Pro Level. However, these instances are also unavailing. Mere references to Defendant Musa's choices on behalf of Pro Level stated in the first person do not create a genuine issue of material fact such that a jury could conclude Pro Level was his alter ego.  (ECF No. 32 at 2). Plaintiff points to no other factual evidence in the record to support its contention that Defendant Pro Level was a mere alter ego of Defendant Musa designed to perpetuate fraud. *See* (ECF No. 31). Without greater factual support for this contention, there does not exist a genuine issue of material fact such that a fact finder could find for Plaintiff in a jurisdiction as reluctant to pierce the corporate veil as Maryland.  Therefore, Defendants' Motion for Summary Judgment with respect to Count I is GRANTED.

> **B.     There Exist Genuine Issues of Material Fact with Respect to the Breach of Contract Claim Against Defendant Pro Level.**

Although Plaintiff and Defendants repeatedly assert that no material facts are in dispute and they are each entitled to judgment as a matter of law, it is clear to the Court that many facts material to determining each of their rights under the Listing Agreement are disputed. Interpretation of a contract is "ordinarily a question of law for the court." *Transamerica Premier Life Ins. Co. v. Selman & Co., LLC*, 401 F. Supp. 3d 576, 592 (D. Md. 2019). In interpreting a contract, "Maryland courts apply the objective theory of contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'" *Id.* at 592 (citation omitted). The matter becomes more complicated, however, when contractual terms are not clear and unambiguous. The

Fourth Circuit has explained that as to summary judgment motions regarding contractual interpretation:

> A court faces a conceptually difficult task in deciding whether to grant summary judgment on a matter of contract interpretation. Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if susceptible to two reasonable interpretations. The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face. If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue. Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis. If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact. *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993) (internal citations and quotations omitted).

*Rock Spring Plaza II, Inc. v. Invs. Warranty of Am.*, 618 F. Supp. 3d 262, 267 (D. Md. 2022) (quoting *Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*, 476 F. 3d 231, 234-35 (4th Cir. 2007)).[10] Ultimately, if "there is a *bona fide* ambiguity in the contract's language or legitimate doubt as to its application under the circumstances … the contract [is] submitted to the trier of fact for interpretation." *Id.* (quoting *Bd. of Educ. of Charles Cnty. v. Plymouth Rubber Co.*, 569 A.2d 1288, 1296 (Md. Ct. Spec. App. 1990)).

Plaintiff correctly points out that binding agreements must involve consideration. *Chernick v. Chernick*, 327 Md. 470, 479 (Md. 1992) (quoting Restatement (Second) of Contracts § 71 (Am. Law Inst. 1981)).  "A written agreement ... may be modified by a subsequent oral agreement, but

---

[10] The *Rock Spring* court applied substantive Maryland law in this diversity breach of contract case. *Rock Spring*, 618 F. Supp. 3d at 268.

the oral modification must be established by a preponderance of the evidence." *Chesapeake Supply & Equip. Co. v. Manitowoc Eng'g Corp.*, 232 Md. 555, 566 (1963). "[T]he determination of whether the conduct of the parties subsequent to the execution of a written contract constitutes a modification is ordinarily a question left to the fact-finder." *Berringer v. Steele*, 133 Md.App. 442, 504 (2000) (citing *University Nat'l Bank v. Wolfe*, 279 Md. 512, 523 (1977)); *see also Hoffman v. Glock*, 20 Md.App. 284, 289 (1974).

      1.    There Exists a Genuine Issue of Material Fact with Respect to Plaintiff's Contract Claim against Defendant Pro Level.

Here, there exist several issues of material fact with respect to a breach of contract claim. From what the Court can discern, the entire dispute stems from uncertain entitlements under the Listing Agreement. First, whether there existed a handshake agreement for an additional 3% commission is an issue for the fact finder. With respect to Plaintiff's consideration argument, the Listing Agreement provides, in pertinent part, "In consideration for the Broker's efforts to sell the Assets of the business, the Seller agrees to pay the Broker, at the time of settlement, 12%;…" (ECF No. 26-5 at 1). According to Defendants, these "efforts" did not include consulting services. (ECF No. 31-2 at 2-3). Thus, providing consulting services constituted additional consideration necessary to effectuate a modification. (ECF No. 30 at 3). According to Plaintiff, the efforts did include consulting. (ECF No. 27-1 at 6-7). However incredulous Plaintiff may find it that his contract with "Pro Level Business Brokerage & Consulting LLC" does not include consulting services, that does not mean the legal issue must be removed from trial. (ECF No. 27-1 at 6-7). Therefore, whether the Listing Agreement provided for consulting services and whether there existed an additional handshake agreement that modified the contract remain genuine issues of material fact a jury must decide. *Rock Spring Plaza II, Inc*, 618 F. Supp. 3d at 267; *see also. Plymouth Rubber Co.*, 569 A.2d at 1296; *Berringer*, 133 Md.App. at 504.

Second, with respect to whether Defendant Pro Level breached the Listing Agreement, there exist many inconsistences within the record regarding what amount, if any, Defendant Pro Level held in escrow and later disbursed to Plaintiff.  The record contains very few financial records, and the parties rigorously argue their interpretations of the facts. Where Plaintiff insists Defendant Pro Level breached the contract by failing to disburse certain payments to him, Defendant Pro Level insists it "received less than it was entitled to receive in commission."  (ECF No. 30 at 4). Where Pro Level argues it "issued a check to Plaintiff for $660,000.00, $30,000.00 of which amount was from Pro Level's commission," Plaintiff retorts, "[The Pro Level Escrow Bank Record Entry] does not provide copies of the canceled checks or proof that a cashier's check in the amount of $660,000 was paid to the Plaintiff from this escrow account." *See* (ECF Nos. 26-1 at 8-9, 31 at 14).  It is true that the bank record is heavily redacted, showing only that a withdrawal in the amount of $660,000.00, and no other financial records (including Plaintiff's bank activity) are available for review.  (ECF No. 26-10).  While a fact finder could very well find this bank record persuasive for Defendant Pro Level, the mere existence of this record does not remove the issue of breach of contract from trial either.  At the same time, it is possible a reasonable fact finder could reject Defendant Musa's testimony and conclude that the payments to which Plaintiff was entitled were not properly made.  Therefore, Defendant Pro Level's Motion for Summary Judgment as to Count II and Plaintiff's Motion for Partial Summary Judgment Against Defendant Pro Level are DENIED.

   2. **Defendant Musa is Entitled to Summary Judgment Because He is Not a Party to the Contract.**

Defendant Musa argues he is entitled to summary judgment with respect to Count II because he was not a party to the contract between Defendant Pro Level and Plaintiff. (ECF No. 26-1 at 8). In response, Plaintiff insists he is entitled to summary judgment against Defendant Pro

Level. Presumably, Plaintiff disputes Defendant Musa's entitlement to summary judgment, though he does not seek summary judgment on this claim against Defendant Musa. *See* (ECF No. 31).

To begin, there is no genuine issue of material fact with respect to personal liability by way of piercing the corporate veil for the reasons stated above. *See supra* Section III.A. Moreover, Defendants correctly point to *Mowbray v. Zumot*, which makes clear that individual members "cannot be personally liable for breach of contract because [they are] not a party" to the contract. *See Mowbray v. Zumot*, 533 F.Supp.2d 554, 564 (D. Md. 2008). Indeed, Maryland LLC members are not personally liable for "the obligations of the company, whether in contract, tort, or otherwise, solely by reason of being a member of the limited liability company." Md. Code. Ann., Corporations & Assn's, § 4A-301. Additionally, Plaintiff cites to no evidence that shows Defendant Musa incurred an obligation on the Listing Agreement in an individual capacity.

For the reasons stated above, Defendant Musa is entitled to summary judgment with respect to Count II. Thus, Defendant's Motion for Summary Judgment on Count II is GRANTED with respect to Defendant Musa.

### C.    There Exist Genuine Issues of Material Fact on the Issue of Whether Defendant Pro Level Failed to Disclose Material Facts Regarding the GTR Title Transfer Despite a Duty to Do So.

Defendants next seek summary judgment on Plaintiff's fraudulent misrepresentation claim. (ECF No. 26-1 at 10). There exist certain nuances in Maryland's fraudulent misrepresentation standards that cannot be accounted for in a corporate veil analysis. *See, e.g.*, *Willis v. Bank of Am. Corp.*, Civil Action No. ELH-14-02615, 2014 WL 3829520, at *18, *39-*40 (D. Md. Aug. 1, 2014) (applying a broader fraud standard on a misrepresentation claim than in its corporate veil analysis when granting a motion to dismiss with respect to both claims). In Maryland, "'[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent

concealment, and fraudulent inducement.'" *Sass v. Andrew*, 152 Md. App. 406, 432 (2003) (citation omitted). To prevail on an intentional misrepresentation claim grounded in fraud, Plaintiff must prove (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation. *Nails v. S & R, Inc.*, 334 Md. 398, 415 (1994). To be actionable, a false representation "must be of a material fact." *Gross v. Sussex, Inc.*, 332 Md. 247, 258 (1993). The "misrepresentation must be made with the deliberate intent to deceive," *Sass*, 152 Md. App. at 430 (citing *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 704 (1998)). Moreover, the defendant must "know[] that his representation is false" or be "recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity." *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 232, 652 A.2d 1117 (1995). In Maryland, the "mere failure to disclose a material fact does not constitute fraud, in the absence of a legal duty to disclose that inheres in certain types of transactions. *Willis*, 2014 WL 3829520, at *18 (D. Md. Aug. 1, 2014).

Review of the Complaint shows Plaintiff primarily alleges fraud but also raises a theory of failure to disclose. (ECF No. 1 at 16). When a plaintiff predicates an intentional misrepresentation claim on a duty to disclose and failure to do so, Maryland has recognized "a duty to disclosure arises where the defendant makes an active misstatement of fact, or only a partial or fragmentary statement of fact, which misleads the plaintiff to its injury." *Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F.Supp.2d 618, 628 (D. Md. 2003) (citing *Lubore v. RPM Associates, Inc.*, 109 Md.App. 312, 330-31 (Md. Ct. Spec. App. 1996).

In *Odyssey Travel Center, Inc.*, a plaintiff travel center company brought a claim of intentional misrepresentation by concealment when a defendant cruise ship company failed to disclose in its itinerary that the vessel lacked two required federal certificates. *Id.* According to the plaintiff there, these omissions constituted "affirmative representations about the vessel's plan for the [cruise] [that were] materially misleading." *Id.* Evidence of the brochure confirmed that the defendant did not disclose its knowledge that the vessel lacked the necessary certificates. *Id.* Reasoning that the plaintiff did "no more than surmise that [the defendant] deliberately withheld information—concerning the lack of certificates and [the defendant's] deteriorating financial conditions—with the intent to defraud," the Court granted summary judgment on the issue of intentional misrepresentation based on fraud. *Id.* Nevertheless, concluding that the defendants failed to disclose and had a duty to do so, the Court nevertheless let the intentional misrepresentation claim survive. *Odyssey Travel Center, Inc.*, 262 F.Sup.2d at 629-30.

Thus, *Odyssey Travel Center* makes clear that fact disputes regarding the existence of an omission are not enough to bar summary judgment in an intentional misrepresentation case. *See id.* To that end, Defendants argue:

> Plaintiff asserts that Defendants are liable for intentional misrepresentation because they mispresented an escrow amount of $1,100,000.00 rather than $980,000.00, then distributed to Plaintiff $600,000.00 rather than $630,000.00, causing monetary damages to Plaintiff, making false representations for the purposes of defrauding Plaintiff. Compl. at ¶¶ 115-126. Plaintiff has presented no material evidence in support of his claim that the check made to him was for $630,000.00 rather than $660,000.00, other than a mischaracterization of a cashier's check paid at the order of Nasim and filed with this Court as Complaint Exhibit 4.

(ECF No. 26-1 at 10).

Plaintiff counters,

> The Plaintiff has alleged that the Defendants falsely represented the amounts held in escrow ($1.1 Million vs. $980,000) as well as the source of $30,000. Specifically,

Plaintiff alleges that Musa misrepresented to Plaintiff that $30,000 of the $630,000 distributed to Plaintiff was paid by Musa, who took possession of the GTR valued at $120,000. According to Defendants, they were entitled to receive $450,000 (15% commission). Using Defendants' numbers of $1.1 Million in escrow funds - $450,000 15% Commission= $650,000, not $660,000 reflected in the bank statement. Exhibit 8 on its face supports the Plaintiff's allegations that Musa gave Plaintiff $630,000 funds held in escrow and an additional $30,000 of Musa's personal funds.

…

The distribution of $660,000 clearly supports Plaintiff's allegations that Musa pretended to give him an additional $30,000 to keep the GTR when, in reality, the $30,000 came from Nasim's down payment held by Pro Level. Moreover, the Defendants have failed to produce a single canceled check or affidavit showing that the $660,000 was paid to the Plaintiff. Indeed, Musa repeatedly references cashier checks, not checks, which also supports Plaintiff's allegations of misrepresentation. In fact, the bank statement reflecting the withdrawal of $660,000 redacts all relevant sections that show the number and the amount of the checks drawn.

…

If Pro Level was truly owed 15% or $450,000, there was no need for Pro Level to pay Plaintiff an additional $30,000. It is undisputed that Pro Level held $980,000 in cash from Nasim in its escrow account. Therefore, the distribution to the Plaintiff should have been $650,000. Pro Level alleged that it already possessed the GTR at $120,000, which left a balance of $330,000 of its $450,000 commission ($120,000 GTR + $330,000= $450,000). The only scenario where the Plaintiff should receive $660,000 is if Musa misrepresented that he would personally pay $30,000 to keep the GTR since there was no need for Pro Level to pay $30,000 of its commission back to Plaintiff.

(ECF No. 31 at 15-17).

Defendants reply, "In a bizarre statement of speculation, Plaintiff appears to concede that "if Pro Level were truly owed 15% commission . . . the distribution to the Plaintiff should have been $650,000." Defendants do not dispute this assertion. However, it has no place in the Opposition."

(ECF No. 32 at 3).

Though the record underlying a number of these arguments is unclear, careful review of the facts available and arguments raised suggests that there exist several disputes including: (1) whether Defendants were entitled to a 15% commission in the first place; (2) whether Defendants

disbursed $660,000.00 to Plaintiff; (3) whether Defendants paid an excess of $30,000.00; (4) whether there existed any promise regarding the title transfer of the GTR; and (5) whether Defendants' disclosure of the source of the $30,000.00 was proper under BAPA and the Listing Agreement. The Court can find only limited factual evidence regarding several of these arguments. It is unclear how any of the facts, if interpreted in Plaintiff's favor, could support an inference of an intent to deceive or defraud Plaintiff. Moreover, to find any evidence of intent to deceive is of considerable difficulty, as Plaintiff has not cited to the record beyond offering speculative interpretations of Defendant Musa's testimony. *See* (ECF No. 31). The evidence does, however, show a bank record depicting a withdrawal from Defendant Pro Level's escrow account in the amount of $660,000.00 (ECF No. 26-10). While Plaintiff challenges the extent of the inferences that the bank record support, Plaintiff points to no facts that support an inference connecting a withdrawal in the amount of $660,000.00 to an intent to defraud. While the record may well support a strong case for a breach of contract, the Court can find no evidence that shows Plaintiff objected to the title transfer in the first place, that Defendant lied about the source of the $30,000.00, or that Defendant Musa did so with the intent to defraud Plaintiff. *See Odyssey Travel Ctr.*, 262 F.Supp.2d at 628-29. There exists much evidence to the contrary in Defendant Musa's deposition. *See generally* (ECF No. 26-4). To that extent, Defendants are entitled to summary judgment.

Following *Odyssey Travel Center*, to the extent that Plaintiff's claim is predicated on a duty to disclose and failure to do so, the Court finds that these factual conflicts create a genuine issue of material fact. Indeed, the parties agree Defendant Pro Level had a fiduciary relationship with Plaintiff. Therefore, based on the reasoning in *supra* Section III.B.2., Defendant Musa is entitled to Summary Judgment as he was not a party to the contracts at issue, Defendant Pro Level

is entitled to Summary Judgment on the issue of an intent to deceive, and the Motion for Summary Judgment on Count III is otherwise DENIED to the extent that there remain genuine issues of material fact on the issue of failure to disclose in the existence of a duty to do so.

### D. There Exist Genuine Issues of Material Fact Regarding Whether Defendant Pro Level Breached a Fiduciary Duty to Plaintiff.

Defendants next move for summary judgment on Count IV, which alleges a breach of fiduciary duty. To prevail on a claim for breach of a fiduciary duty, Plaintiff must show (1) the existence of a fiduciary relationship; (2) breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary. *Plank v. Cherneski*, 469 Md. 548, 559 (2020). "If a plaintiff describes a fiduciary relationship, identifies a breach, and requests a remedy recognized by statute, contract, or common law applicable to the specific type of fiduciary relationship and specific breach alleged, a court should permit the count to proceed." *Id.*

To begin, it is undisputed that Defendant Pro Level owed a fiduciary duty to Plaintiff by way of the Listing Agreement. (ECF No. 26-1 at 12-13). Moreover, it is undisputed that Plaintiff seeks a remedy recognized by contract that is applicable to the alleged breach. *See id.*; (ECF No. 31). Defendant Pro Level urges there is no genuine issue of material fact to substantiate a breach. (ECF No. 26-1 at 12-13). However, based on the analysis of the existing factual disputes regarding Defendant Pro Level's disclosures and distributions set forth above, the Court applies the same reasoning here. Therefore, Defendant Pro Level is not entitled to summary judgment with respect to a breach of its fiduciary duties to Plaintiff.

With respect to Defendant Musa, the arguments require additional consideration beyond that set forth in *supra* Section III.B.2. Plaintiff argues Defendant Musa owed Plaintiff a fiduciary duty because he is the sole member of Defendant Pro Level. (ECF No. 31 at 17-18). Plaintiff relies

on the doctrine of *respondeat superior*[11] and agency principles in support of its argument. *See id.* Such arguments rely on a misapplication of the agency rules.[12] To be sure, a member of an LLC owes to the LLC—not third parties—fiduciary duties. *See Plank*, 469 Md. at 578 ("After discussing at length the duties owed by an agent to a *principal*, including the duty of loyalty and duty to disclose information material to the agency, we pointed out that under our existing case law, damages were available for the breach in the form of lost profits.") (emphasis added).

Here, there Listing Agreement does not make a single reference to Defendant Musa as an individual. *See* (ECF No. 26-5). Rather, Defendant Pro Level is defined as the "Broker" that incurred all obligations under the contract. *See id.* After careful review of the record, the Court can find no evidence that supports a duty Defendant Musa owed Plaintiff in his individual capacity. Of course, insofar as Defendant Musa acted in his capacity as an agent of Pro Level, his conduct will be under scrutiny with respect to Plaintiff's fiduciary claim against Defendant Pro Level. Indeed, Plaintiff's fiduciary arguments may well result in a fact finder's decision in his favor against Defendant Pro Level.  However, consistent with the reasoning above, there exists insufficient factual support to conclude Defendant Musa and Defendant Pro Level were one and the same. There is simply no evidence to conclude Defendant Musa acted in his individual capacity. Therefore, Defendant Musa is entitled to summary judgment with respect to Count IV. Therefore, Defendants' Motion for Summary Judgment on Count IV is GRANTED with respect to Defendant Musa and DENIED with respect to Defendant Pro Level.

---

[11] To be clear, the doctrine of *respondeat superior* provides a basis upon which to "impute[] liability for a cause of action to a principal." *Stewart v. Bierman*, 859 F.Supp.2d 754, 768 n.8 (D. Md. 2012). Accordingly, Maryland does not recognize the theory of *respondeat superior* as a cognizable cause of action. *Williams v. Coppin State Univ.*, Civil No.: 1:23-cv-02590-JRR, 2024 WL 3904676, at *17 (D. Md. Aug. 22, 2024).

[12] Plaintiff further argues Defendant Musa breached the fiduciary duty of loyalty because he engaged in a "self-dealing" transaction. (ECF No. 31 at 17-18). However, Plaintiff, as a third-party contractor with Defendant Pro Level, does not have standing to bring such claims. *See Plank*, 469 Md. at 578.

**E.    There Exist Certain Genuine Issues of Material Fact under Maryland's Uniform Fraudulent Conveyance Act.**

Finally, Defendants move for summary judgment on Count V, which Plaintiff brings under the Maryland Uniform Fraudulent Conveyance Act, Md. Code Ann., Com. Law § 15-201 *et seq*. ("MUFCA").  As Defendants point out, "MUFCA is made up of several statutes, the statutes specifically recited in the Complaint being described here."  (ECF No. 26-1 at 14). At issue here are the following provisions:

> Md. Com. Law Code § 15-205 states "Every conveyance made without fair consideration when the person who makes it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and other persons who become creditors during the continuance of the business or transaction without regard to his actual intent."
>
> …
>
> Md. Com. Law Code § 15-207 states "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors, is fraudulent as to both present and future creditors."
>
> …
>
> Md. Com. Law Code § 15-209 states that "If a conveyance or obligation is fraudulent as to a creditor whose claim has matured, the creditor, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase or one who has derived title immediately or immediately from such a purchaser, may (1) have the conveyance set aside or obligation annulled to the extent necessary to satisfy the claim; or (2) levy on or garnish the property conveyed as if the conveyance were not made."

(ECF No. 26-1 at 14-16).

Defendants insist there exists no genuine issues of material fact under MUFCA for various reasons. *See id.* Plaintiff retorts, emphasizing the consideration argument set forth under the breach of contract argument. (ECF No. 31 at 19).

First taking Md. Code Ann., Com. Law § 15-205, Defendants aver *Residential Warranty* requires summary judgment because "the 'creditor-debtor relationship must exist for maintenance

of a suit under the fraudulent conveyance statute[.]'" (ECF No. 26-1 at 15) (quoting *Residential Warranty*, 126 Md.App. at 313). In *Residential Warranty*, the court declined to analyze whether transfers from a defendant corporation to the sole shareholder were fraudulent when the plaintiff asserted MUFCA claims against the shareholder. *Residential Warranty*, 126 Md.App. at 313. Reasoning that there may be a claim against the corporation, plaintiff did not have a claim within the meaning of MUFCA against the shareholder because he "could never have anticipated that appellant would be a future creditor of [him] personally" and the "creditor-debtor relationship must exist for maintenance of a suit under the fraudulent conveyance statute." *Id.* (citing *Dixon v. Bennett*, 72 Md.App. 620 (1987)). Moreover, the court noted that because there was no genuine issue of material fact with respect to proving that the shareholder had an intent to defraud plaintiff, the plaintiff was also unable to prove "the conveyance of which they complain was made with the intention and design to defraud." *Id.* at 314 (citing *Neeb v. Atlantic Mill & Lumber Realty Co.*, 176 Md. 297, 306 (1939)).

Consistent with the analysis in *supra* Section III.A., the Court again finds the *Residential Warranty* reasoning persuasive. *See Residential Warranty*, 126 Md.App. at 313-14. Having found no genuine issue of material fact with respect to Defendant Musa's personal liability on the Listing Agreement, *Residential Warranty* requires this Court to dismiss the MUFCA claims against Defendant Musa. *Id.* Indeed, there exists no evidence showing Defendant Musa could have anticipated Plaintiff would become his personal creditor. *Id.* at 313. Plaintiff insists, "The Defendants' reliance on caselaw shielding a distribution to its members is misplaced since the existence and adequacy of consideration for the initial conveyance of the GTR to Pro Level are disputed facts that can only be determined at trial." (ECF No. 31 at 20). However, this argument is unavailing. To be sure, assuming that there is a genuine issue of material fact with respect to

the existence and adequacy of consideration for the initial conveyance of the GTR to Pro Level, this factual conflict does not create a genuine issue of material fact with respect to whether Defendant Musa would anticipate Plaintiff as a creditor of him in a personal capacity. Thus, Defendant Musa is entitled to summary judgment under MUFCA. Based on the Court's finding that there exist several fact disputes with regard to consideration, Defendant Pro Level is not entitled to summary judgment under Md. Code Ann., Com. Law § 15-205.

Regarding Md. Code Ann., Com. Law § 15-207, Defendants argue there is no evidence to support a finding that Defendants acted with an intent to "hinder, delay, or defraud creditors." (ECF No. 26-1 at 15). To be sure, § 15-207 "permits a transfer to be avoided" if there existed either an intent to hinder, delay, or defraud a creditor or constructive fraud, which is not at issue here. *See In re Rood*, 459 B.R. 581, 602 (D. Md. 2011). When assessing such claims,

> Maryland courts rely on badges of fraud as indicia for exposing fraudulent intent and establishing the knowledge necessary for a fraudulent conveyance, such as insolvency or indebtedness of the transferor, lack of consideration for the conveyance; a relationship between the transferor and the transferee; the pendency or threat of litigation; secrecy/concealment; departure from the usual method of business; transfer of the debtor's entire estate; reservation of benefit to the transferor; and the retention by the debtor of actual possession of the property.

*Id.*

To that end, Plaintiff argues,

> The subsequent [GTR title] conveyance to Musa, who was not a party to the Listing Agreement, occurred on July 7, 2024, well after Musa became aware that Nasim was dissatisfied with the sale. Consequently, whether Pro Level's alleged distribution to Musa of the GTR was an act intended to obstruct, hinder, and delay Plaintiff's ability to repossess the GTR is also a disputed fact that must be determined at trial.

(ECF No. 31 at 21).

Again, the Court can find no evidence on the record—nor does Plaintiff point to any—that supports this assertion. First, there exists no evidence that Defendant Musa only received title to the GTR after he knew Nasim was dissatisfied with the sale or any evidence showing a connection between such knowledge and an intent to interfere with Plaintiff's rights to repossess the GTR. The Court can find no factual evidence showing Plaintiff even contemplated taking title to the GTR, nor that Defendant Musa knew of any desire to have it based on their contractual relationship. Plaintiff again relies upon previously stated speculative interpretations of Defendant Musa's testimony. Though there is some fact dispute regarding the sufficiency of consideration and the rights under the Listing Agreement, none of the *In re Rood* factors have sufficient factual support such that a fact finder could hold Defendants liable under § 15-207. *In re Rood*, 459 B.R. at 602. Therefore, Defendants are entitled to summary judgment under § 15-207.

Finally, turning to Md. Code Ann., Com. Law § 15-209, MUFCA provides "that once a conveyance is proven to be fraudulent, a creditor has the option of either having the conveyance set aside or disregarding the conveyance and attaching or levying execution upon the property conveyed." *See Molovinsky v. Fair Empl. Council of Greater Wash., Inc.*, 154 Md.App. 262, 284 (2003). Having concluded that there exists a genuine issue of material fact regarding sufficiency of consideration based on the contract dispute under Md. Code Ann., Com. Law § 15-205, summary judgment is necessarily barred under § 15-209. *Molovinsky*, 154 Md.App. at 284.

Therefore, Defendants' Motion for Summary Judgment on Count V is GRANTED with respect to Defendant Musa and DENIED as to Defendant Pro Level under Md. Code Ann., Com. Law §§ 15-205, 15-209.

## IV.    CONCLUSION

For the foregoing reasons, it is this 15th day of December 2025 ORDERED:

(1) Defendant Pro Level's Motion for Summary Judgment is GRANTED with respect to Count I;

(2) Defendant Pro Level's Motion for Summary Judgment is GRANTED in part and DENIED in part with respect to Count III and V;

(3) Defendant Pro Level's Motion for Summary Judgment is DENIED with respect to Counts II and IV;

(4) Defendant Musa's Motion for Summary Judgment is GRANTED;

(5) Plaintiff's Motion for Summary Judgment (ECF No. 27) is DENIED; and

(6) The parties are hereby directed to confer and jointly inform the Court within fourteen (14) days from the date of this Memorandum Order and Opinion whether there is mutual desire to participate in another settlement conference with Judge Austin before proceeding to schedule a trial and related dates.

Date: <u>December 15, 2025</u>                    _____/s/_____
                                                 J. Mark Coulson
                                                 United States Magistrate Judge